(C. D. 2016)

JOHN S. CONNOR v. UNITED STATES

United States Customs Court, Second Division

(Decided July 11, 1958)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*George Cochran Doub,* Assistant Attorney General (*Richard E. FitzGibbon and
Sheila N. Schwartz,* trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: This case relates to importations of so-called steel pins or wire pins, having a diameter of 0.294 to 0.296 inches and 1¼ or ⅝ inches long.

The collector of customs classified the merchandise as articles, wholly or partly manufactured, composed in chief value of base metal, in paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and duty was imposed thereon at the rate of 22½ per centum ad valorem.

The five protests enumerated in the attached schedule, which is incorporated herein, were consolidated for hearing and determination.

At the trial, plaintiff relied upon the following three claims which are contained in the protests directly or by amendment:

1. We claim that the merchandise should be classified as rivets brightened, with duty at 15% ad valorem, under paragraph 332, as modified, T. D. 51802.

2. We also claim that the merchandise should be classified under paragraph 331, as modified, T. D. 51802, as nails or spikes made of iron or steel wire, not less than 1 inch in length, nor smaller than $65/1000$ of 1 inch in diameter, for which the duty was $3/10$ cents per pound. That claim is made in connection with the articles that are 1¼ inches long.

3. On the articles that are ⅝ inches long, we made the claim, under paragraph 331, with duty at 1½ cents per pound, under the provision for other iron or steel nails, not specially provided for.

It was pointed out by plaintiff that the last two claims are predicated upon the length of the particular articles.

The text of the statutes involved herein, so far as pertinent, reads as follows:

Paragraph 397, as modified, *supra*:

Articles or wares not specially provided for, whether partly or wholly manufactured:

\*       \*       \*       \*       \*       \*       \*

Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

\*       \*       \*       \*       \*       \*       \*

Other \* \* \*_____ 22½% ad val.

Paragraph 332, as modified, *supra*:

Rivets, studs, and steel points, lathed, machined, or brightened, and rivets or studs for nonskidding automobile tires_____ 15%   ad   val.

Paragraph 331, as modified, *supra*:

Nails, spikes, tacks, brads, and staples, made of iron or steel wire:
   Not less than one inch in length nor smaller than sixty-five one-thousandths of one inch in diameter_____ ⅗₀¢   per   lb.

Paragraph 331 of the Tariff Act of 1930:

\* \* \* horseshoe nails, and other iron or steel nails, not specially provided for, 1½ cents per pound; \* \* \*.

The evidence introduced at the trial consists of the testimony of Gerard Janssen of Samesco, Hemiksem, Belgium, which was taken before a vice consul of the United States at Antwerp, Belgium, under a commission issued by this court; and also the oral testimony of James G. Edelen.

The substance of Janssen's testimony follows: He has been a civil engineer for 10 years in charge of the manufacture of wire products with Samesco, Hemiksem, Belgium, the latter appearing to be the seller of wire and wire products made by the firm of Sambre-Escaut in Hemiksem; that he was familiar with the merchandise shipped to J. G. Edelen Co., Inc., Baltimore (for whose account the subject merchandise was imported), having participated in the past 3 or 4 years in its production and having charge of the section in the factory where the articles were produced. As stated by the witness, "\* \* \* I know how the pins are made on the machines"; that "These pins are made on

rivet machines, solid die single stroke header machines"; and that, in the manufacture of wire pins, "* * * we use hard drawn low carbon steel (mild steel wire)." The witness stated that he knew the material used was steel wire, by reason of a chemical analysis and its mechanical properties. Further, the witness gave the following detailed explanation of the method of producing the merchandise in controversy:

> We are starting with wire rods. We draw the wire rods till the final diameter, then we make the pins with the rivet machines. On these machines we cut the length necessary to make the wire pin and we make the two ends as follows: one side with a flat hammer which makes the chanfered end, the other side with the ejector which will be used to eject the pin. Then the pins are polished with lime and sawdust. The pins are delivered in barrels of 100 lbs. The rivet machines are the only machines used for this processing.

The witness added, "* * * They are not lathed."

Plaintiff's witness, James G. Edelen, testified, in substance, that he is president of the J. G. Edelen Co., the ultimate consignee herein, his business being, principally, the manufacturing of hardware and dealing in upholsterers' supplies. He had been in the general hardware business about 40 years and, during that time, had dealt in various types of nails and rivets, which he had sold in practically all parts of the United States. Among the various nails the witness had dealt in were "common wire nails; miscellaneous wire nails; nails with special points, like needle points; brad points; diamond points; headless; duck-bill points; blunt points; pointless; barbed," to which he added "Headless. * * * Flat heads; round heads; oval heads; headless." He referred to the merchandise in controversy, represented by exhibits 2 and 3, as samples of nails without heads. The witness then produced a diamond-point headless barbed nail, about ⅝ inch long, a shoe nail, headless and pointless, about ½ inch long, and a heel nail, also headless and pointless, but 1 inch long. These items were received in evidence as collective illustrative exhibit 4.

The witness produced another sample, received in evidence as illustrative exhibit 5, a double-pointed U-shaped article, of which the witness said: "Some people call them staples, but they are, primarily, known as nails or staples; depends upon what purpose you use them for."

Counsel for plaintiff stated that the purpose of introducing exhibits 4 and 5 was to illustrate different types of nails, adding that, while "The dictionary indicates that usually nails have heads and points, but there are, I understand, various nails that do not possess those characteristics, such as the type of nail before the Court, *which is commonly referred to as a pin * * *.*" [Italics supplied.]

The witness, Edelen, was then interrogated in respect to the subject of rivets, although claiming that the articles in controversy are

often sold as nails. He testified that he had sold different types of rivets throughout the United States during the past 35 or 40 years, some of the types comprising "Black iron rivets with heads; round heads; flat heads; oval heads and various other types of heads, and some without heads."

The witness was then interrogated as to the use of the merchandise in controversy, represented by exhibits 2 and 3, and answered as follows: "That's driven into the—and they're used for other purposes, but generally speaking, into bed posts. In those posts, there's a slot. I have an exhibit here, if you want to see it, on which they're driven in by hammer into the bed post * * *." In most cases, "* * * They pre-bore an undersized hole for the screws for rapid driving * * * to prevent splitting." Directing his attention to exhibit 2, which was said to be slightly chamfered on both ends, the witness explained that it was done "to keep from splitting the wood; faster driving * * * both ends are chamfered so they can drive as they pick up." In other words, the form of the articles facilitates driving it into the post and results in greater efficiency.

Illustrative exhibits 6 and 7 were received in evidence to illustrate how exhibits 2 and 3 are actually used in the construction of certain bedsteads, to quote:

They are driven, usually into the wooden side—into the wooden rails, known as a siderail for wooden beds. There's also a slot in the siderail; they're driven, and the bed hook is placed in the slot and the nails or pins are driven through the wooden rail, through the holes prepared in the bed hook; then again into the other section of the wooden rail.

The uses of articles like exhibit 3 and the method of their application are the same as above described in respect to exhibit 2.

Referring again to the subject of pins, the witness was asked: "In the hardware business, what is a pin?"

A. Well, we have different types of pins, but in this instance, this [referring to exhibits 2 and 3] *is known as a pin, in our trade, a post pin*, headless——
* * * * * * *
A. *Headless pin—nail pin; pin, primarily, it's called*; pointless, headless pin or rivet or whichever you see fit to call it. *We commonly call it a pin because*—— [Italics supplied.]

Further, the witness testified with respect to what is a pin as follows:

In the hardware business, these are—I'll try to get it straight—in the hardware business, a pin ordinarily is made from steel or wire of a given diameter; it could be a blunt point; a chamfered point; a sharp point with a head or without a head. There's a wide ramification of what would be a pin, the same as a wide ramification of nails, * * *.

When asked if the merchandise in controversy came under the general category of nails, the witness replied:

Well, for what we use them for specifically, they have been called nails. *Generally, we call them, in the furniture business, for this particular type, we call them pins,* but some, the factories call them nails. They'll order them "Send us some of those nails."

  &ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

&ast; &ast; &ast; *We call them pins.* [Italics supplied.]

The foregoing extracts from the testimony of the witnesses are illustrations of the confused record with which we are confronted and from which it is difficult to formulate a satisfactory basis upon which to rest our decision.

Plaintiff contends that, since there is no specific tariff provision for pins of the hardware or furniture variety, such pins belong in the general category of nails, spikes, or rivets, pointing to the statement that certain pins are defined as nails or as rivets, citing the following definition from Webster's New International Dictionary, second edition, 1948:

pin &ast; &ast; &ast;, *n.*   18,   *Printing.*   A small wire nail, used esp. in mounting plates on wood.

Reference is also made to an illustration of an item referred to as a "barbed-wire dowel-pin" in Funk and Wagnalls New Standard Dictionary (1942) and to the New Century Dictionary (1946) where a rivet is described as "A metal pin &ast; &ast; &ast;."

The references above quoted fail to convince us that a pin of the hardware or furniture variety is a nail or a rivet within the common acceptation of those terms.

Plaintiff, in its brief, also invites our attention to the case of *E. Hennigson Co., Inc.* v. *United States,* 56 Treas. Dec. 934, Abstract 10367, wherein this court held that certain glider nails, which were adjusted to the legs of chairs and furniture as a protection against wear and tear due to friction with the floor, should be classified as nails. Reference is also made to the case of *Robert Currie* v. *United States,* 35 Treas. Dec. 197, T. D. 37818, wherein wedge-shaped horseshoe nails, designed for greater security in traveling over icy surfaces, were held to be dutiable as horseshoe nails. The following is quoted from the decision therein:

&ast; &ast; &ast; Such a provision [horseshoe nails] includes all articles commonly and commercially recognized and employed as horseshoe nails, whether of a common or improved variety.

We find nothing in the last two cited cases which lends support to the plaintiff's contention.

Plaintiff's brief also cites various definitions of the word "nail" in Webster's New International Dictionary, Webster's New Collegiate Dictionary, and The New Century Dictionary, all of which refer to a slender piece of metal usually or generally with one end *pointed.* That conforms to our conception of the meaning of the term "nail" in common speech and, consequently, we regard the claim for classi-

fication of the imported articles as nails to be untenable. Equally untenable is the claim that either of the exhibits represents what may properly be termed a spike. According to the definition cited in plaintiff's brief from Webster's New International Dictionary, a spike is "a kind of very large nail" which does not, in our opinion, adequately describe the subject merchandise.

Plaintiff relies upon our decision in *Remington Rand, Inc.* v. *United States*, 20 Cust. Ct. 1, C. D. 1075, wherein we held that certain headless lengths of soft iron wire, designated by the manufacturer as "Stator Rivets" and "Rotor Rivets," were subject to classification as rivets of iron, not specially provided for, in paragraph 332 of the Tariff Act of 1930.

The exhibits in that case are in the files of the court. We have examined them and have noted the physical differences between them and exhibits 2 and 3 in the case now before us. It appears from our decision in the *Remington* case, *supra*, that the articles there involved measured 0.598 and 0.529 of 1 inch in length and 0.093 of 1 inch in diameter, whereas the measurements of exhibits 2 and 3 in the instant case are 1¼ inches and ⅝ of 1 inch long and 0.294 to 0.296 of 1 inch in diameter. These measurements show substantial differences in the diameters of the merchandise in the two cases.

We have reviewed the *Remington* case, *supra*, in which were set forth several lexicographic definitions of the word "rivet" and wherein we then stated—

As pointed out above, some lexicographic authorities describe a "rivet" as "a short soft metal pin having *usually* a head on one end, used to connect *two* plates of metal or other substances together * * *." [Italics supplied.] Other definitions indicate that a rivet may be used to connect two *or more* plates; still other definitions omit the word "usually" in defining a "rivet." However, it is the opinion of the court, which seems to be borne out by thoughtful consideration of various definitions of the word "rivet," that rivets may be made with or without a head on one end, and may be used to connect two plates of metal or other substances, or more than two such plates. We conclude, therefore, that the provision in paragraph 332, *supra*, for "rivets of iron or steel, not specially provided for" embraces rivets of all kinds when of the materials specified and when used in the manner above described.

Noting the variations in the definitions of the word "rivet," which were cited in the *Remington* case, we concluded that "considering the character, nature, form, shape, material of which made, and *exclusive use* of the imported commodity," [italics supplied] the articles there before the court responded to the popular conception of what were commonly known as rivets.

It will be recalled that the exclusive use of the rivets in the *Remington* case was for the manufacture of electric shavers "to hold together a multiplicity of laminations."

An examination of exhibit 7, in the instant case, clearly indicates that the items represented by exhibit 3 are not used to hold together

two or more plates but, rather, they are inserted in the wooden portion of exhibit 7 for the purpose of holding in place a metal bed-rail hook.

Exhibit 6 illustrates the manner in which the merchandise, represented by exhibit 2, is used, and while the so-called pins do hold two strips of wood together, nevertheless, they do not respond to our conception of the term "rivet," which is supported by the following definitions, quoted in the *Remington* case, *supra*:

Webster's Daily Use Dictionary (Grosset & Dunlap, 1932 Edition) * * *

*rivet, n.* a short metal bolt clinched by hammering.

\* \* \* \* \* \* \*

Funk & Wagnalls New Standard Dictionary, 1932 Edition * * *

*rivet*—a short soft metal pin having *usually* a head on one end, used to connect two plates of metal or other substance together by passing it through holes and spreading its headless end by hammering or pressing until a second head is formed. [Italics quoted.]

Webster's Collegiate Dictionary, Abridged, 1904 Edition * * *

*Rivet, N.* A metallic pin or small bolt, usually with a head, *used for fastening things together by beating down or clinching one or both of its ends.* [Italics quoted.]

The merchandise here in controversy does not have a head on either end; neither is it "clinched by hammering." As a matter of fact, in the use of exhibits 2 and 3, as disclosed by an examination of exhibits 6 and 7, one end of the pin is entirely concealed in the wood.

The factual differences in the design, construction, and utility between the articles in the *Remington* case and those in the instant case are so substantial that it would be an undue extension of our decision in the *Remington* case to find it controlling here.

Upon the record before us and for the foregoing reasons, we are constrained to hold that plaintiff has failed to overcome the presumption of correctness attending the decision of the collector of customs.

The protests are overruled in all respects and judgment will issue accordingly.