(C.D. 2718)

C. J. TOWER & SONS OF BUFFALO, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided June 23, 1966)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Charles P. Deem* and *Harvey A. Isaacs*, trial attorneys), for the defendant.

Before RAO, FORD, and WILSON, Judges: WILSON, Senior Judge, concurring

RAO, Chief Judge: The two cases here involved, which have been consolidated for purposes of trial, pose the question of what is the proper rate of duty to be levied upon an importation of metal articles described in the invoices as spiral nails.

The collector of customs at the port of entry classified this merchandise as steel bars within the purview of paragraph 304 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and, accordingly, assessed duty thereon at the rate of 1½ cents per pound or at the rate of 10½ per centum ad valorem, depending upon value.

It is the contention of plaintiff that these articles are dutiable either at the rate of $\frac{2}{10}$ cent per pound as nails or spikes made of iron or steel wire, or at the rate of ½ cent per pound as spikes, not specially provided for, within the provisions of paragraph 331 of said tariff act, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802.

The language of the respective provisions appears as follows:
Paragraph 304, as modified, *supra*—

Bars, whether solid or hollow (except hollow bars and hollow drill steel valued above 4 cents per pound):

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

Valued over 12 cents but not over 16 cents per pound _____ 1.5¢ per lb.
Valued over 16 cents per pound_____ 10½% ad val.

Paragraph 331, as modified, *supra*—

Nails, spikes, tacks, brads, and staples, made of iron
or steel wire:
    Not less than one inch in length nor smaller
    than sixty-five one-thousandths of one inch
    in diameter_____     $2/10$¢ per lb.

\*      \*      \*      \*      \*      \*      \*

Spikes, tacks (not including thumb tacks), brads, and
    staples, not specially provided for_____     $1/2$¢ per lb.

Two samples of the merchandise in issue are in evidence as, respectively, plaintiff's exhibits 1 and 2. They are alike in that they are both spirally fluted metal bars approximately 11¾ inches in length, without head or point. They differ only in the fact that one end of exhibit 2 is slightly tapered or beveled.

John W. Webster, vice president and general manager of D. B. Frampton & Co., Doweloc Division, of Columbus, Ohio, the true importer of the subject merchandise, testified on behalf of plaintiff. This witness, who has been involved in all facets of the company's business, including production, engineering, purchasing, selling, and administration, for the 10 years of his association therewith, personally placed the order for the merchandise at bar. It was intended for use in the company's manufacturing operations which consist of the production of a special type of flooring called "Doweloc" used in railroad cars, gymnasiums, bowling alleys, squash courts, industry, and the like.

The item which was ordered from The Steel Co. of Canada was a so-called "Ardox nail" with the head and point cut off, and in the case of plaintiff's exhibit 2, with a taper on the end. According to this witness, he has ordered similar items in the United States where they are commonly called "dowels."

With the aid of a miniature section, introduced in evidence as plaintiff's illustrative exhibit 3, Mr. Webster described the manufacturing process of a "Doweloc" floor as follows:

\* \* \* Actually, most of the planks or panels are one foot wide and composed of 14 of these four-quarter strips turned on edge after they have been faced, tongued, and grooved, which you can see here. So that it makes a plank one foot wide, and we make it in lengths up to 70 feet long.

\*      \*      \*      \*      \*      \*      \*

After the components have been turned on edge and assembled by hand they are squeezed laterally and vertically to hold them together tightly.

\*      \*      \*      \*      \*      \*      \*

\* \* \* Then a drill is put through the lateral or the width of the entire plank to form a hole that in diameter is to the pitch diameter

of the dowel, which is then inserted through hydraulic hammer-head pressure.

The witness further explained that hydraulic hammerhead pressure is in reality a pressure pin in a tube which pushes the dowel through the scant hole which has been drilled laterally through the strips. It has the appearance of a hammerhead except that it is slightly concave and, in fact, is a development beyond the hand hammer which had previously been used for this purpose. As pressure of 2,700 pounds per square inch is applied, the dowel is forced through the hole in the planks, and since the crest of the flutes is of greater diameter than the drilled hole, the dowel forms its own grooves in the wood as it is being pushed, by spinning, and by this process the planks are held together.

These articles were described as having three diameters: The root, or smallest diameter, was given as 0.33 of an inch; the outside, or crest diameter, as 0.38 of an inch, and the pitch, or mean diameter, as halfway between. Originally they were ordered without head or point, but proved unsatisfactory as the articles tended to jam inside the machine, and later importations of this merchandise were of the one tapered end variety. As is evidenced by the appearance of plaintiff's exhibit 2, the taper is exceedingly slight, barely discernible, and although it was characterized in the record as a pointed end, we would not consider it to be such under any reasonable interpretation of the word "pointed."

Mr. Webster identified the two metal components of exhibit 3, which are representative of the imported merchandise, and pointed out that one of them is sawn through the longitudinal section to illustrate the way in which these articles are inserted. A third metal object in the exhibit was stated to be a nail. The only other uses of such or similar articles with which this witness was familiar were as substitutes for S-irons in holding the ends of crossties together, but that would be of a different size, or to fasten timbers together in the construction of wood bridges.

It further appears from the testimony of this witness that, in the terminology of the industry, both in Canada and in the United States, spirally fluted articles of the type here involved are known as Ardox nails, although his company prefers to call them dowels. In his opinion, they would properly be considered to be nails, or spikes which he regarded as simply large nails, since they are composed of metal and serve the function of holding several pieces of wood or other material together. While he declined to qualify himself as an expert on the subject of nails, he stated that his company had purchased considerable quantities of nails in connection with installations of its floorings; that some of those nails had neither heads nor points, although the

majority did, and that blunt-end nails are becoming more prevalent since pointed nails have a tendency to cause wood to split.

Although this witness had not seen production procedures of the Canadian manufacturer of the merchandise at bar, he had seen similar articles manufactured by the Screw & Bolt Corp. of America in Pittsburgh, Pa. They were there made with the use of a wire and roller dies to form the flutes in a continuous process and then cut to desired lengths.

Plaintiff's second witness was Mr. Charles K. Hill II, vice president and sales manager of the Hillwood Manufacturing Co., of Cleveland, Ohio. This company is engaged in the business of manufacturing special nails sold under the name of "Helix" spiral ring, barb-hole threads, wire tacks, pointed and double-pointed tacks, furniture and upholstery nails and staples. In his 10 years of experience with the company, Mr. Hill had become familiar with the manner in which various types of nails, as well as merchandise of the class represented by exhibits 1 and 2, were produced. He identified those exhibits as being of a kind marketed by The Steel Co. of Canada and by Jones and Laughlin in the United States as Ardox nails. His factory produces a similar article from round wire which is grooved on a spiral machine, or groover. It is then transferred to a cold header which can produce the article in any size, shape, or dimension, with or without a head, with or without a point. The articles are thereafter polished, cleaned, and, if desired, heat treated, coated, or finished to particular specifications.

This witness was of opinion that there was no fine line of distinction between a steel spike and a steel nail, but that the difference, if any, would be defined in terms of use and the person who used it. He considered articles like exhibits 1 and 2 to be nails, which determination on his part was predicated upon their use. He also expressed the opinion that nails are usually produced from finished wire or cut from plate, and that exhibits 1 and 2 are not cut nails, but are wire nails originally produced from wire, and he considered the tapered end of exhibit 2 to be a point.

During the course of the cross-examination of Mr. Hill, the following interchange took place:

Q. I am going to read you a definition of the word "nail" from Funk & Wagnall's New Standard Dictionary, 1941 Edition, as follows: "nail—4. A piece of metal consisting of a slender body, shank, or tang, usually tapering toward or pointed at one end and having a head at the other end, used for driving into or through wood or other material to fasten one piece to another, or to serve as a projecting pin upon which things may be hung." Do you agree with that definition?—A. That definition has one word in it, "usually," it is a fine definition but it does not cover the nail industry.

Q. Do you contend, then, that there are nails which are of such a nature that they are not included in that definition?—A. Very definitely, sir.

Q. Do you consider this nail, Exhibits 1 and 2, as included or excluded from that definition?—A. I think that would be dependent upon the word "usually."

Mr. Hill further stated that, based upon his experience in the trade, a nail does not necessarily have to have a point or a head.

Testimony of the two witnesses, hereinabove summarized, and the three enumerated exhibits comprise the record in the instant case, no evidence having been adduced on the part of the defendant. Careful analysis of plaintiff's proof tends to suggest that the articles in issue are claimed to be nails because they are known in the trade by a name which includes the word "nail," to wit, Ardox nail, and because they are used for a purpose for which nails are used, to wit, to hold together two or more pieces of wood or other material. Apparently, however, it is the second of these two theories upon which counsel for plaintiff relies in the brief filed in its behalf. The definition of the word "nail," as stated in Webster's New International Dictionary, unabridged, second edition (1961),[1] is quoted in support of the argument that neither a head nor a point is an indispensable feature of a nail, and that given a slender metal object, the only significant characteristic to be considered in determining if it is a nail is the way in which it can be used. Counsel for defendant retorts, however, that the articles in issue are simply fluted metal bars which do not resemble nails in *any* significant respect since the function of holding together two or more pieces of wood, metal, or other material does not serve to distinguish a nail from a dowel, a pin, or a peg. The following definitions of these allegedly related articles, taken from Webster's Third New International Dictionary, 1963 edition, are called to our attention:

dowel, *n.* 1. A headless, smooth, or barbed pin, usually of a circular section, fitting into corresponding holes in abutting pieces to act as a temporary fastening or to keep them permanently in their proper relative position; * * *.

pin, *n.* 1. A usually cylindrical piece of wood, metal, or other material used especially for fastening separate articles together, * * *.

peg, *n.* 1. A small, usually cylindrical, pointed or tapered piece of wood, metal, or other material, used to pin down or fasten together * * *.

It is obvious from the foregoing discussion that neither party herein relies upon the rule of commercial designation for the construction of

---

[1] nail, n. * * * 2. A more or less slender, usually pointed piece of metal * * * generally with a head intended to be struck by a hammer, used for driving into or through wood or other material to hold two or more pieces together, * * *

the *eo nomine* provisions for nails and spikes in paragraph 331, as modified, *supra*, and a determination of whether the articles at bar are embraced within those terms. Seemingly, the various references in the record to the trade terminology of the nails in issue as Ardox nails do not purport to suffice as instruments for maintaining that such articles respond to a trade understanding of the term "nail," which is uniform, general, and definite and differs from the common meaning thereof. Moreover, it is not completely clear from the proof in this case that the subject merchandise in its condition as imported, minus head and point, apparently removed after the Ardox nail first attained that state, remained an Ardox nail within the understanding of those dealing in such products.

Under well-settled principles of law, where the question of commercial designation is not in issue, the meaning to be ascribed to a tariff term is its common meaning, and the ascertainment of common meaning is a matter of law to be determined by the court on the basis of its own understanding of what that meaning is. *United States* v. *Florea & Co., Inc.*, 25 CCPA 292, T.D. 49396; *United States* v. *O. Brager-Larsen*, 36 CCPA 1, C.A.D. 388. In reaching its conclusion with respect to common meaning, it is the privilege of the court to refresh its recollection by resorting to relevant lexicographical and other standard authorities. *United States* v. *John B. Stetson Co.*, 21 CCPA 3, T.D. 46319. Testimony of witnesses experienced in the handling of the product may also be considered, but such testimony is advisory only and not binding upon the court. *Stephen Rug Mills* v. *United States*, 32 CCPA 110, C.A.D. 293; *Absorbo Beer Pad Co., Inc.* v. *United States*, 30 CCPA 24, C.A.D. 209.

Taking under advisement all of the factors relevant to a determination of the meaning of the words here in issue, we are not persuaded by the evidence in this case or, indeed, by any other consideration that these articles are nails or spikes as those words are commonly understood. The definition of the word "nail," called to our attention by counsel for plaintiff, appears in a relatively recent edition of Webster's New International Dictionary. Its earlier counterpart, in effect at the time of the enactment of the present provision for nails in 1930, does not seem to differ in any essential respect. It recites a "more or less slender, usually pointed piece of metal * * * generally with a head intended to be struck by a hammer, used for driving into or through wood or other material to hold two or more pieces together, or as a support from which pictures, etc., may be hung, and occasionally for ornamental purposes."

While it is true that neither definition sets forth any single physical characteristic indispensable to the concept of what a nail is, both create a picture of an article which in form possesses one or more of the

features enumerated. A metal rod which has neither a point nor a head, which is deeply fluted, which can only be inserted into a pre-drilled hole, and which revolves as it penetrates, seems scarcely to conform to that picture in any respect.

Reference to prior judicial consideration of the provisions for nails and spikes for the classification of similar objects tends to fortify us in our conclusion that the articles here in issue are neither nails nor spikes as those words are commonly construed.

In the case of *C. Solomon, Jr.* v. *United States*, 4 Cust. Ct. 11, C.D. 270, certain metal articles, called variously wiggle nails, corrugated nails, and "Jew" nails, were claimed to be nails, not specially provided for, within paragraph 331 of the Tariff Act of 1930, predicated upon their use in holding together two pieces of wood to form or fasten a joint, as in boxes, and testimony to the effect that a nail does not have to have a head. The court rejected this contention for the reason that, in its opinion, the articles would not be encompassed by any dictionary definitions of nails, but would, on the contrary, be properly described as fasteners.

Certain drive pins for use in holding together several pieces of metal material, inserted by means of a powder-actuated gun, were held to be so like common, ordinary nails as to fall within the provisions of paragraph 331, even though they were made of material of a higher quality, in the case of *Fastening Devices, Inc., Rohner Gehrig & Co., Inc.* v. *United States*, 40 Cust Ct. 345, C.D. 2004, and the court disregarded as irrelevant the fact that the pins were inserted by means of a powder gun rather than a hammer. It stated:

* * * The method of inserting the nails does not change their character as nails. They are nails when driven manually, and they remain nails when driven by a powder-actuated gun.

By contrast, metal pins for use in bedposts were held not to be nails in the case of *John S. Connor* v. *United States*, 41 Cust. Ct. 26, C.D. 2016. It was there established that the articles in issue were headless pins used for driving into bedposts, generally into holes that were prebored to accommodate the pins; that, while the importer referred to the articles as pins, they were also sometimes called nails; and that many nails are produced without heads and some are both headless and pointless. The court found the evidence too confusing to carry any conviction that the pins in issue conformed to the common understanding of what a nail is and stated:

Plaintiff's brief also cites various definitions of the word "nail" in Webster's New International Dictionary, Webster's New Collegiate Dictionary, and The New Century Dictionary, all of which refer to a slender piece of metal usually or generally with one end *pointed*. That conforms to our conception of the meaning of the term "nail" in com-

mon speech and, consequently, we regard the claim for classification of the imported articles as nails to be untenable. Equally untenable is the claim that either of the exhibits represents what may properly be termed a spike. According to the definition cited in plaintiff's brief from Webster's New International Dictionary, a spike is "a kind of very large nail" which does not, in our opinion, adequately describe the subject merchandise. [Emphasis quoted.]

To the foregoing, we might now add that a spike is also defined as a pointed object. Considering the language of the provisions under which the instant merchandise is claimed to be dutiable, which embraces, in addition to nails and spikes, tacks, brads, and staples, also by definition pointed objects, we incline to the view that what Congress had in mind in providing, *inter alia*, for nails and spikes were articles such as the court referred to in the *Connor* case, *supra*, as the common, ordinary variety of nail, which, if not pointed, at the very least must possess some characteristics typical of nails or spikes in general.

We have carefully considered other cases cited to us by counsel for the plaintiff, but find nothing therein conducive to a contrary view.

By reason of the foregoing considerations, we find and hold that plaintiff has failed to establish herein that the subject merchandise consists of articles which are either nails or spikes. All claims in these protests are, therefore, overruled.

Judgment will be entered accordingly.

### CONCURRING OPINION

WILSON, Senior Judge: In this case, I agree with the decision that the protests should be overruled. However, I do not concur with the majority opinion in sustaining the collector's classification. An examination of the exhibits in the case, coupled with the consideration of the oral evidence presented, convinces me that the protests should be overruled without sustaining the collector's classification which was made under the provisions of paragraph 304 of the Tariff Act of 1930, as modified, as steel bars dutiable at the rate of 1½ cents per pound or 10½ per centum ad valorem, according to the value.

The items under examination meet none of the specifications essential for identification as steel bars. They do not conform to the common understanding of what constitutes bars, nor are they similar in use, nor do they conform to any of the definitions given for bars. In my opinion, they are more properly classifiable as spikes or nails under paragraph 331 of the Tariff Act of 1930, as modified, than as bars, although I think the plaintiff failed to meet its burden of proof in establishing its claim that the merchandise should be classified as spikes or nails. The merchandise is properly classifiable under the provisions of paragraph 397 of the Tariff Act of 1930 as held in the

case of *C. Solomon, Jr.* v. *United States*, 4 Cust. Ct. 11, C.D. 270, in which the court held, page 15 as follows:

Upon the entire record we therefore hold that in the absence of any *eo nomine* provision covering the same the merchandise is properly dutiable at the rate of 45 per centum ad. valorem under paragraph 397 of the Tariff Act of 1930 as manufactures of metal not specially provided for, as classified by the collector.

The evidence in this case shows that the metal fasteners really resemble dowels more than nails or bars. There is no *eo nomine* provision for dowels in the tariff act.

The law properly applicable to this case is stated in *Innis Speiden & Co.* v. *United States*, 14 Cust. Ct. 121, C.D. 924, at page 126, as follows:

The instant protest was filed under and by virtue of the provisions of section 514 of the Tariff Act of 1930. We think that in all suits filed under that section involving the classification of merchandise, the court must, of necessity, determine the correct classification, if there is evidence before it upon which such a determination may be made. If the plaintiff makes the correct classification claim and there is evidence to support it, judgment must be rendered in favor of the plaintiff. If the correct classification claim is not made, even though there be evidence establishing the proper classification, judgment must be rendered in favor of the defendant, without approving the classification of the collector.

The court cannot, of course, render a judgment which would, in effect, reclassify the merchandise outside the limits of the issue as drawn by the classification of the collector and the protest of the plaintiff. In cases where the correct classification has been found to be outside those limits, the judgment of this and our appellate court has consistently been that the protest must be overruled without affirming the action of the collector, and we are satisfied that such must be the order in this case.

In my opinion, therefore, the protests should have been overruled without sustaining the classification of the collector.