**HAL MARKS & ASSOCIATES, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**C.D. 3123; Protest No. 65/19-77516.**

United States Customs Court,
Second Division.

Sept. 20, 1967.

Stein & Shostak, Los Angeles, Cal., (S. Richard Shostak, Los Angeles, Cal., of counsel), for plaintiff.

Carl Eardley, Acting Asst. Atty. Gen., (James S. O'Kelly and Avram Weisberger, New York City, trial attys.), for defendant.

Before RAO, Chief Judge, and FORD, Judge.

RAO, Chief Judge:

Plaintiff herein seeks a determination of the proper classification for the assessment of customs duties of certain merchandise described on the commercial invoice accompanying the entry covered by the above enumerated protest as follows:

### IRON STAPLES

½″ Conduit Staples, Nickel plated Iron * * *

¾″ Electrical Metal Tube Staples * * *

¾″ Conduit Metal Tube Staples * *

1″ Electrical Metal Tube Staples * * *

1″ Conduit Metal Staples * * *

½″ Electrical Metal Tube Staples * * *

Upon importation at the port of Los Angeles, the customs authorities classified said merchandise as articles or wares, not specially provided for, composed wholly or in chief value of iron or steel, in paragraph 397 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas.Dec. 150, T.D. 54108, and imposed duty thereon at the rate of 19 per centum ad valorem.

The protest claim is that said articles should properly have been classified as staples within the purview of paragraph 331 of said tariff act, as modified by the General Agreement on Tariffs and Trade, 82 Treas.Dec. 305, T.D. 51802, and subject to duty at the rate of ½ cent per pound. By amendment to the protest, two other claims were presented wherein it is alleged that the imported

articles are properly subject to duty at only 0.2 cent per pound as cut nails, over 2 inches long, in paragraph 331 of the Tariff Act of 1930, as modified by the Torquay Protocol to said General Agreement, 86 Treas.Dec. 121, T.D. 52739, or in the alternative are dutiable at 1.25 cents per pound as iron or steel nails, not specially provided for, in said paragraph 331, as modified by the sixth protocol, supra. The latter claim for duty at the rate of 1.25 cents per pound was subsequently abandoned by the plaintiff and will, accordingly, be dismissed. The specific language in the various statutory provisions relied upon is here set forth for ready reference:

Paragraph 397 of the Tariff Act of 1930, as modified by the sixth protocol, supra:

Articles or wares not specially provided for, * * *:

\* \* \* \* \* \*

Composed wholly or in chief value of iron, steel, * * *:

\* \* \* \* \* \*

Not wholly or in chief value of tin or tinplate:
Carriages, drays, * * *.

\* \* \* \* \* \*

Other, composed wholly or in chief value of iron, steel, * * * 19% ad val.

Paragraph 331 of said tariff act, as modified by the General Agreement on Tariffs and Trade, supra:

Spikes, tacks (not including thumb tacks), brads, and staples, not specially provided for ... ½¢ per lb.

Paragraph 331 of said Tariff Act of 1930, as modified by the Torquay protocol, supra:

Cut nails and cut spikes, of iron or steel, over 2 inches long . 0.2¢ per lb.

In addition to the entry papers which were received in evidence without being marked, the record upon which this case is submitted for decision consists of the testimony of two witnesses who appeared on behalf of plaintiff and three

exhibits, two of which were offered by plaintiff and one by defendant.

Hal Marks, associated with the plaintiff-importer, identified an article as representative of the merchandise in controversy and stated that said article corresponds with the invoice item "½″ Conduit Staples, Nickel plated Iron * * ". He explained that the "½ inch" stands for the "arc" of the article and that none of the items in issue was under 2 inches in length. The representative sample referred to was received in evidence as plaintiff's exhibit 1. Said exhibit may be described broadly as shaped like the figure "7" with the horizontal portion definitely arc-shaped rather than level. The article is flat and appears to have been produced by stamping. It measures approximately 2¼ inches in length, tapering from top to bottom from ¼ to ⅛ of an inch, and is 1¼ inches in greatest width.

Marks stated that he had the articles made in Japan for a particular customer in the United States, namely, the Economy Manufacturing Company, electrical wholesalers, and that both he and the customer referred to the article as electrical staples. After Marks testified to seeing an article such as exhibit 1 used "many many times", the following testimony appears on direct examination—

Q. How have you seen it used?

What is it doing when you see it used?

—A. It's just holding something together, that's all.

Q. Describe what it holds and how it holds it, if you would?—A. For example, in your own home, when they are roughing out a home, where years ago they took a nail and pounded it into a stud, they put a piece of pipe on it and bent it over. Right now this thing replaces it. It's just so much easier and faster.

Q. Does it hold a pipe to the wall? —A. It can hold pipe, it can hold almost anything.

The imported articles are affixed by means of a hammer or an automatic staple gun.

The witness explained that, in securing a pipe to a wall with the use of the imported article, said article does not penetrate the pipe but fastens or holds it.

Received in evidence as defendant's exhibit A was a box of wire staples which plaintiff's counsel admitted are the type of staples used to fasten papers together.

On being asked, Witness Marks testified that exhibit 1 has only one piercing point whereas the staples comprising exhibit A have two piercing points. He agreed with the definition of a staple read to him from Webster's New International Dictionary, second edition, as: "A fastener with two points which are driven into the holding surface," and admitted that exhibit 1 does not have two points which are driven into a holding surface.

Marks also stated that he agreed with the following definition of "nail" appearing in Funk & Wagnalls New "Standard" Dictionary (1942)—

A piece of metal consisting of a slender body, shank, or tang, usually tapering toward or pointed at one end, and having a head at the other end, used for driving into or through wood or other material to fasten one piece to another, or to serve as a projecting pin upon which things may be hung.

Al R. Perl, plaintiff's second witness, stated that he had been in the automotive parts rebuilding business for approximately 15 months. Prior to that time, he was one of the principals of Economy Electric Supply for 5 years and prior thereto was with Ace Wholesale Electric for approximately 11 years, 9½ years of which he was the general manager. In the course of that employment, he dealt daily with electrical contractors and with other persons interested in electrical products. He became familiar with articles such as exhibit 1 and with others similar thereto. He ordered items such as exhibit 1 from the Marks company and sold them to his customers as "conduit staples."

Witness Perl stated that he was familiar with the Independent Nail & Packing Company of Bridgewater, Mass., which he identified as one of the largest manufacturers in the United States of nails and fastening devices, which company produced "The Stronghold Line". When shown a catalog of said company he stated he was familiar with the items depicted in the upper right-hand corner of page 17 inasmuch as he had purchased such items from the Independent Nail & Packing Company prior to buying from the plaintiff company. He testified that he bought and sold such articles as conduit staples. He stated also that the articles appearing on page 17 of the catalog (which page was received in evidence as plaintiff's exhibit 2) differ from those in issue only insofar as the articles depicted in the catalog are round whereas those at bar are flat but that there is no difference in use.

At the conclusion of the testimonial presentation, plaintiff's counsel stated his willingness to stipulate that only one "surface" of exhibit 1 pierces, and counsel for both parties agreed that, if Witness Perl were asked the same questions as the previous witness regarding defendant's exhibit A, he would give the same answers.

Two claims are relied upon by plaintiff. One is that the imported articles are "staples" and are, therefore, within the purview of paragraph 331 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade. The second contention is that the articles at bar are "nails" and come within the *eo nomine* provision therefor in said paragraph 331, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade.

Inasmuch as there is no attempt to prove a commercial designation for the merchandise at bar which differs from its common meaning, classification of the instant importation must be predicated on the common meaning

to be ascribed to the claimed terms "nails" and "staples." As stated by this court in the relatively recent decision in C. J. Tower & Sons of Buffalo, Inc. v. United States, 57 Cust.Ct. 20, C.D. 2718—

Under well-settled principles of law, where the question of commercial designation is not in issue, the meaning to be ascribed to a tariff term is its common meaning, and the ascertainment of common meaning is a matter of law to be determined by the court on the basis of its own understanding of what that meaning is. United States v. Florea & Co., Inc., 25 CCPA 292, T.D. 49396; United States v. O. Brager-Larsen, 36 CCPA 1, C.A.D. 388. In reaching its conclusion with respect to common meaning, it is the privilege of the court to refresh its recollection by resorting to relevant lexicographical and other standard authorities. United States v. John B. Stetson Co., 21 CCPA 3, T.D. 46319. Testimony of witnesses experienced in the handling of the product may also be considered, but such testimony is advisory only and not binding upon the court. Stephen Rug Mills v. United States, 32 CCPA 110, C.A.D. 293; Absorbo Beer Pad Co., Inc. v. United States, 30 CCPA 24, C.A.D. 209.

For a consideration of whether the articles at bar are "staples", reference is made to the following dictionary definitions:

Webster's New International Dictionary of the English Language, second edition (1957)—

staple, n. * * * 2. A loop of iron, or a bar or wire, bent and formed with two points to be driven into wood, etc., to hold a hook, pin, or the like; also a similarly shaped piece of thin wire, driven through papers, etc., and clinched to bind them.
*    *    *    *    *    *

Funk & Wagnalls New "Standard" Dictionary of the English Language (1956)—

staple, n. 1. Mech. (1) A U-shaped piece of metal made by bending a small bar or wire and pointing the ends: often driven into wood, to serve as a fastening or part of a fastening by receiving the eye of a hasp, the point of a hook, the end of a bolt, etc. * * *
*    *    *    *    *    *

From the foregoing definitions it is evident that, for an article to be included within the common meaning of the word "staple", it must be a loop or U-shaped piece of metal, both ends of which have been pointed, and be used as a fastener when driven into wood or other material.

Applying said definition to the so-called staple at bar, the court finds from the testimonial record and a visual examination of plaintiff's exhibit 1 that the imported article not only is not U-shaped but also it has only one end which has been pointed for insertion into wood or other material. It follows that the imported articles are not within the common meaning of the word "staple" and, therefore, can not be classified as such for customs duty purposes within the claimed provision in paragraph 331. The fact that the article is so described on the commercial invoice accompanying the entry papers herein and the further fact that it may be bought and sold as a conduit staple do not, absent proof of commercial designation, deter us from this conclusion. In the case of Prosser v. United States, 1 Ct.Cust.Appls. 29, T.D. 30850, in determining the proper classification of certain cast-iron disks, the court took occasion to say—

* * * Counsel argues that a plate as ordinarily understood is a piece of metal *approximately* flat and even surfaced; that a disk as ordinarily understood is any flat, circular plate—any plane or surface that is flat and circular or approximately so; that the goods under consideration are universally known as disks; that consequently they are disks, and therefore they are plates. Unfortunately, for this argument, the evidence establishes

nothing more than that the invoice describes the importation as "cast-iron grinding disks" and is very wide of showing that the wares are universally or even generally, commonly, or ordinarily known as disks. *We can not hold that an invoice name finally fixes the status, nature, or character of an importation. To do so would enable the importer to fix his own rate of duty or none at all, as best pleased him.* [Italics supplied.]

In the light of the record evidence here presented, the court finds and holds that plaintiff has failed to sustain its burden of proof in support of the claimed classification of the instant articles as staples within the purview of paragraph 331 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade. Accordingly, said claim will be overruled.

Consideration must next be given to the claim for classification of the importation as cut nails, of iron or steel, over 2 inches long, in said paragraph 331, as modified by the Torquay protocol, supra. Inasmuch as the parties stipulated and agreed during the course of the hearing of this case that the articles in controversy are "cut", that they are composed "of iron or steel", and that they are over "two inches" in length, it only remains to be determined whether said articles come within the common meaning of the term "nail".

■ On the point of whether or not the imported articles are nails within the purview of paragraph 331 of the Tariff Act of 1930, as modified, supra, plaintiff in its brief states:

The rule of interpretation relative to *eo nomine* provisions has controlled the determination of the scope of the provision for nails in Par. 331 of the Tariff Acts of 1930 and 1922, and it has been consistently held that if the imported merchandise falls within the common meaning of the term "nail", it is classifiable as such.

With this statement of principle, the court is in complete accord.

Lexicographic authorities provide the following definitions of the word "nail":

Webster's New International Dictionary of the English Language, second edition (1957)—

nail, *n.* * * * 2. A more or less slender, usually pointed piece of metal * * *, generally with a head intended to be struck by a hammer, used for driving into or through wood or other material to hold two or more pieces together, or as a support from which pictures, etc., may be hung, and occasionally for ornamental purposes. * * * Nails are variously named from their use, shape, size, etc., as barbed, basket, boat, box, chair, floor, roofing, shingle, diamond, four-penny * * *, galvanized, tinned, upholsterer's, etc.

\* \* \* \* \* \*

Funk & Wagnalls New "Standard" Dictionary of the English Language (1956)—

nail, *n.* * * * 4. A piece of metal consisting of a slender body, shank, or tang, usually tapering toward or pointed at one end and having a head at the other end, used for driving into or through wood or other material to fasten one piece to another, or to serve as a projecting pin upon which things may be hung.

\* \* \* \* \* \*

Nails are named (1) from their use, or the thing with which they are used; as, *boat-nail, clamp-n.* (large and broad-headed, for holding clamps to a vessel's ribs), *coffin n., doubling n.* (used to fasten on sheathing), *finishing n.* (having a small narrow head, not conspicuous in finished work) * * *; (2) from their construction and shape; as, *countersunk n.* (having a beveled head calculated to sink into a surface), *diamond n.* (having a rhomboidal head), *flat n.* (a wrought-iron nail of small size with a thin broad head), *rose n.* (having a flat or conical head with facets.).

\* \* \* \* \* \*

Audels Mechanical Dictionary (1942)—

A small pointed piece of metal, usually with a head, to be driven into a board or other piece of timber, and serving to fasten it to another timber, or left projecting; as, from a wall, to hang anything upon. The different sorts of nails are named either from the use to which they are applied, or from their shape; as, shingle, floor, ship carpenters' and horseshoe nails, roseheads, diamonds, etc.

Although broad in scope, in order to cover the varied uses to which nails are put, the dictionary definitions above set forth provide certain distinguishing characteristics which set nails apart from other articles. These characteristics are that nails are more or less slender, tapered, or pointed, pieces of metal, which have a head, are intended to be struck by a hammer, are used for driving into or through wood or other material to hold two or more pieces together, or as the support from which pictures may be hung, and that said articles are named from their use or the thing with which they are used, or from their construction or shape. In the instant case, the so-called "iron staple" or "conduit staple" at bar which has been described above as having the appearance of the figure "7" with the horizontal portion arc-shaped rather than level does not possess the shape of a nail as described in the foregoing lexicographic authorities and is not used as a nail for driving into or through wood or other material to fasten one piece to another or as a projection from the wall from which a picture may be hung. And the record evidence on the matter of use is that the imported articles are used to hold in place a piece of pipe against a wall during the process of construction of a building. The imported articles would, therefore, appear to be more in the nature of brackets or clamps and not of nails.

Consideration has been given to the various cases cited by the parties hereto, and we find nothing therein to deter us from the conclusion herein reached.

In the course of the decision in the case of C. J. Tower & Sons of Buffalo, Inc. v. United States, 57 Cust.Ct. 20, C.D. 2718, in holding that certain spirally convoluted metal bars were neither nails nor spikes within the purview of paragraph 331 of the Tariff Act of 1930, as modified, this court took occasion to say—

By contrast, metal pins for use in bedposts were held not to be nails in the case of John S. Connor v. United States, 41 Cust.Ct. 26, C.D. 2016. It was there established that the articles in issue were headless pins used for driving into bedposts, generally into holes that were prebored to accommodate the pins; that, while the importer referred to the articles as pins, they were also sometimes called nails; and that many nails are produced without heads and some are both headless and pointless. The court found the evidence too confusing to carry any conviction that the pins in issue conformed to the common understanding of what a nail is and stated:

Plaintiff's brief also cites various definitions of the word "nail" in Webster's New International Dictionary, Webster's New Collegiate Dictionary, and The New Century Dictionary, all of which refer to a slender piece of metal usually or generally with one end *pointed.* That conforms to our conception of the meaning of the term "nail" in common speech and, consequently, we regard the claim for classification of the imported articles as nails to be untenable. Equally untenable is the claim that either of the exhibits represents what may properly be termed a spike. According to the definition cited in plaintiff's brief from Webster's New International Dictionary, a spike is "a kind of very large nail" which does not, in our opinion, adequately describe the subject merchandise. [Emphasis quoted.]

To the foregoing, we might now add that a spike is also defined as a point-

534

ed object. Considering the language of the provisions under which the instant merchandise is claimed to be dutiable, which embraces, in addition to nails and spikes, tacks, brads, and staples, also by definition pointed objects, we incline to the view that *what Congress had in mind in providing, inter alia, for nails and spikes were articles such as the court referred to in the Connor case, supra, as the common, ordinary variety of nail, which, if not pointed, at the very least must possess some characteristics typical of nails or spikes in general.* [Italics supplied.]

In the light of the foregoing considerations, inasmuch as the iron or conduit staples at bar are lacking in the essential characteristics typical of nails, they do not come within the common meaning of the term "nails" within the provision for such articles in paragraph 331 of the Tariff Act of 1930, as modified by the Torquay protocol. Plaintiff's claim for such a tariff classification must, therefore, be overruled.

Judgment will issue in accordance with the holdings above expressed.

FORD, J., concurs.