**BORDER BROKERAGE COMPANY et al., Plaintiffs,**

**v.**

**UNITED STATES, Defendant.**

**C.D. 2947; Protests Nos. 64/1665–24086, etc.**

United States Customs Court, Second Division.

April 6, 1967.

Glad & Tuttle, San Francisco, Cal. (George R. Tuttle, San Francisco, Cal., of counsel), for plaintiffs.

Barefoot Sanders, Asst. Atty. Gen. (Glenn E. Harris and Avram Weisberger, New York City, trial attys.), for defendant.

Before RAO and FORD, Judges.

| | | |
|---|---|---|
| Entry 05 3834 | — | H–82 links |
| 05 4531 | — | H–78 link |
| 05 5327 | — | H–78–S links |
| 05 5364 | — | H–82 LP chain links |
| 05 5464 | — | H–104 chain links |

RAO, Chief Judge.

These two protests have been consolidated for the purpose of trial.

Protest 64/1665 relates to certain "Conveyor Chain Parts," namely, chain links, more specifically identified at the time of trial as consisting of the items of merchandise identified on the various entries as follows:

———◆———

Protest 64/1691 is concerned with certain "rivets" designated as "H 78 Rivets" on the invoice accompanying entry 05 7321 and as "C 132S Rivets" on the invoice accompanying entry 05 7944.

Both the chain links and the rivets were classified by the collector of customs as articles or wares, composed wholly or in chief value of iron or steel, not specially provided for, in paragraph 397 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas.Dec. 150, T.D. 54108, and subjected to duty at the rate of 19 per centum ad valorem.

The gist of plaintiffs' protests is as follows:

Protest 64/1665, re the chain links:

Should be classified as follows:

1) Par. 372 TA @ 10½%
2) Par. 329 @ 12½%

Protest 64/1691, re the rivets:

Should be classified as follows:

1) Under Par. 329 TA @ 12½%
2) Under Par. 332 TA @ ½¢ per lb.
3) Under Par. 372 TA @ 11½¢ per lb.
4) Under Par. 353 TA @ 13¾%

The principal claim relied upon by plaintiffs is that the chain links and the rivets are parts of chains used for the transmission of power in paragraph 329 of the Tariff Act of 1930, as modified by the Japanese Protocol to the General Agreement on Tariffs and Trade, 90 Treas.Dec. 234, T.D. 53865, supplemented by Presidential Notification, 90 Treas. Dec. 280, T.D. 53877, for which duty at the rate of 12½ per centum ad valorem is provided, or that the chain links should be so classified and the rivets classified within the *eo nomine* provision therefor in paragraph 332 of said tariff act, as modified by the General Agreement on Tariffs and Trade, 82 Treas.Dec. 305, T. D. 51802, and assessed with duty at the rate of ½ cent per pound.

As to the alternative claim for classification of the merchandise as parts of machines, not specially provided for, in paragraph 372 of the Tariff Act of 1930, as modified, protest 64/1665 erroneously claims a rate of *10½* per centum ad valorem, and protest 64/1691 erroneously claims a rate of 11½ *cents per pound.*

When these cases were called for hearing, plaintiffs' counsel moved to amend protest 64/1665 to include a claim for classification of the chain links as parts of articles having as an essential feature an electrical element or device in paragraph 353 of the tariff act, as modified, and the assessment of duty at the rate of 13¾ per centum ad valorem.

The trial judge agreed to the amendment of the protests to correct the erroneous references to the rates of duty

in paragraph 372 and to expand the scope of the paragraph 353 claim to include the chain links "with the understanding that the amendment in writing would be made a part of the record" and with the direction to plaintiffs' counsel to "File your written motion for amendment for the record."

It does not appear from the respective case records that the amendments called for were ever filed. Whereas such inadvertence is not condoned, the failure to amend the protests in the manner as directed will not preclude the court from consideration of the valid protest claims invoked in paragraphs 329 and 332 of the tariff act, as modified. The provisions of the latter paragraphs relied upon by plaintiffs read as follows:

Paragraph 329 of the Tariff Act of 1930, as modified by the Japanese protocol, supra:

All other chains used for the
transmission of power, and
parts thereof ....... 12½% ad val.

Paragraph 332 of said act, as modified by the General Agreement on Tariffs and Trade, supra:

Rivets of iron or steel, not
specially provided for ... ½¢ per lb.

The record upon which the court is called upon to determine the instant controversy consists of the testimony of two witnesses, one for the plaintiffs and the other for the defendant, and various exhibits which will be referred to during the course of this opinion.

Thomas I'Anson associated with I'Anson Industries, Inc., the actual importer of the merchandise at bar, appeared on behalf of plaintiffs. I'Anson had been president of I'Anson Industries for the past 6 years and prior thereto was general manager and vice president of the A-1 Steel and Foundry in Vancouver, Canada, which was engaged in the same type of business as I'Anson Industries, namely, the manufacture of products of their own design including chain used in the sawmill industry, pulpmills, and construction industry. Said chain, according to the witness, is made in many different sizes and types and is used for conveying refuse and so forth in sawmills.

The witness testified to his familiarity with the five different items of chain links and the two items of rivets, set forth above. As representative thereof, plaintiffs' exhibits 1, 2, and 3 were received in evidence, exhibit 1 representing the H-78 and H-78-S links, exhibit 2 the H-82 LP and H-82 links, and exhibit 3 the H-104 chain links. Plaintiffs' exhibit 4, received in evidence, is representative of the H-78 rivets. And as plaintiffs' 5, there was received a combination article consisting of links and rivet which was described as being representative of the C 132 rivet in issue and the use to which such rivets would be put for chain purposes. Pages 12, 13, 14, 15, 20, and 21 of an I'Anson Industries catalog were received in evidence as plaintiffs' illustrative exhibit 6, pages 12 and 13 of which depicted chain link items H-78 and H-82, and page 14 illustrating the H-104 chain links. Pages 20 and 21 depicted sprockets which drive the chain.

I'Anson stated that he had observed the manufacture of both the rivets and chain links in Canada and that he has supervised their manufacture and had handled their sale both in Canada and in the United States. He added that he had sold such merchandise to the sawmill industry, the pulpmill industry, and to construction industries throughout the United States. He also testified that he had supervised the design of loghaul machinery, refuse conveyor machines, sawdust conveyor machinery, chipper infeed machines, and similar machines in which chains would be used.

When witness I'Anson was called upon to describe the process of assembling chain, he stated that the link of the chain is placed in position with its male or female component end and the chain and the holes aligned so that a rivet can be inserted. The rivet is fastened in place thereby providing a continuous chain.

A schematic drawing of a loghaul and bundling installation using such chain was received in evidence as plaintiffs'

collective exhibit 8. In the particular installation, electric motors were used as the motivating power but steam could be substituted. The witness stated that the conveyor chain under discussion is not limited in use to such a device as is depicted in plaintiffs' collective exhibit 8 but that the various sizes of chain are adaptable to any type of conveyor apparatus and they are so used.

I'Anson defined a conveyor as a machine which performs the function of taking a mass or an article from one place to another. The object can rest on the chain, be in front of the chain, or underneath the chain. He added that sometimes a distinction is made between a drive chain and a conveyor chain. He stated that the speed of operation of a drive chain and a conveyor chain would depend on the particular application of the machine with which it is used and that usually a drive chain will approximate the same speed as a conveyor chain.

I'Anson was asked what said chains would drive or power when the H–78, H–82, and H–104 chain links were assembled into chains and used in a conveyor system. The witness replied that they transmit power from the drive motor to the other end of the conveyor, which power can be transmitted to other machines. They may be connected in series from one to the other from the same individual motor much like a belt drive. He drew an analogy to belt drives in machine shops in the old days when they would transmit power from one machine to the other from the same motor. The witness stated that this can happen on a conveyor. In some applications, the conveyor chain drives something else with it and carries power into other machines such as a barker application, with the use of one motor. In such event, you would have a multiple conveyor setup for economical use of power. He stated it is quite common in the sawmill industry to use a chain for multipurposes, that is, to transmit the initial power of the machine to other devices in series as well as to convey material or refuse. An instance of this would be a loghaul chain driving a barker which takes bark off logs and then driving a rear conveyor chain through a cut-off saw.

On behalf of defendant, Harvey V. Eastling was called to testify. Eastling, who holds a bachelor of science degree in mechanical engineering and is a registered engineer in the State of California, worked for 37 years with the Link-Belt Co., and for 5 years previous thereto as San Francisco representative of the Jeffrey Co. of Columbus, Ohio, in the same line of business, to wit, the manufacture of various types of chains. The witness is presently retired but does engage in some consulting work. While with the Link-Belt Co., he served as chief engineer, vice president, and manager for the west coast. During his employment, he gained a familiarity with various types of power transmission and conveyor chains.

He is familiar with the types of chains designated as H–78, H–82, and H–104. He referred to H–78 chains as a chain of about 2½-inch pitch which is commonly used and is made by a number of manufacturers on the west coast. The H–82 chains, he explained, is a larger chain with a 3-inch pitch, and he referred to the H–104 chain as a "refuse" chain used exclusively in sawmills and pulpmills.

When shown plaintiffs' exhibit 2, Eastling stated that it is a cast link with a 6-inch pitch and, although it has H–82 S 4 cast into it, the article is not representative of the H–82 chains in the United States. It is twice as long as the standard H–82 size and, in his opinion, it would be strictly a conveyor chain. He testified that anyone designing a power transmission chain in the United States would not use anything like exhibit 2, explaining that a good drive chain is made with shorter pitch links.

Eastling stated that exhibits 1 and 3 are similar, if not identical, with the H–78 and H–104 chain links made in the United States.

When asked if the chain industry draws a distinction between power transmission chain and conveyor chain, the witness replied in the affirmative. Power transmission chain would be one used to connect two shafts using chain and sprockets for the purpose of transmitting power from a drive source to the second shaft, whereas a conveyor chain would be one used to convey or push material along either on a flat surface or in a trough. When asked if he would call a chain which does nothing except convey material which rests upon the top of the chain or on the chain is some fashion as a chain which is transmitting power, Eastling replied in the negative, stating that the designation in the industry for such an article would be "conveyor chain."

In determining the proper classification for customs duty purposes of the chain links and rivets at bar, which are used in conjunction with one another, it is deemed a more orderly procedure to consider their classification individually.

To succeed in its claim that the chain links in issue are parts of chains used for the transmission of power, plaintiffs must prove that the chains of which the links are part are used *chiefly* for the transmission of power. It is *chief* use that controls the classification of merchandise for customs purposes. Bob Stone Cordage Co. et al. v. United States, 51 CCPA 60, C.A.D. 838. And "the question of whether 'chief use' has been properly established depends upon the issue and the evidence in each case." United States v. F. W. Woolworth Co., 23 CCPA 98, T.D. 47765.

From the testimony of record in the present case, it appears that the chains formed from the chain links in controversy were designed for use and were used in the sawmill industry, the pulpmill industry, and construction industry to convey logs or other material from one point to another—in other words, principally for purposes of conveying material. It was pointed out, however, that, simultaneously with the function of con-

veying, the chain at times could be used to transmit power from the original drive motor to other machines connected in series with the conveyor. The extent of the respective uses is not set forth in the record before us, but the substance of plaintiffs' testimony is to the effect that the chains would be chiefly used for conveying purposes.

Plaintiffs cite the case of General Chain & Belt Co. v. United States, 42 Cust.Ct. 115, C.D. 2074, contending in its brief that "Conveyor chain almost identical in use to that involved herein was held * * * dutiable under this provision."

In the *General Chain* case, supra, certain steel roller chains, having a 4-inch pitch, used in various industrial plants to transmit power from an electric motor and convey articles that may be attached to them were held to be chains used for the transmission of power in paragraph 329 of the Tariff Act of 1930, as modified. As in the present instance, the merchandise in that case had been classified within the provisions of paragraph 397 of said act, as modified, as articles not specially provided for, in chief value of base metal. In the course of its decision in the *General Chain* case, supra, the court stated:

There does not appear to be any judicial precedent directly in point which would be decisive of the present issue. Reference is made, however, to the case of United States v. Henry Greenberg & Bros. Export & Import Co., Inc., 44 C.C.P.A. (Customs) 48, C.A.D. 636, wherein, in reversing the court below, it was held that roller chain in 100-foot rolls, designed for use on bicycles, constituted chains used for the transmission of power. * * *

In the absence of judicial precedent, it is interesting to note that, in the Summary of Tariff Information (1929), prepared for use by the House Committee on Ways and Means in connection with the preparation of the Tariff Act of 1930, with regard to paragraph 329, under the caption

"CHAINS"—"Description and uses," the following appears:

The chains included under this paragraph are usually composed of wrought iron, steel, or malleable iron. Structurally, chains are of two types: (1) Block or sprocket chains, each link of which consists of several pieces of metal, joined together by cylindrical pins. These chains are mostly used for transmitting power. (2) Coil chains, made of interlocking oval links, each link consisting of a single piece of metal. The links may be studded by a crosspiece in the center which makes them stronger. In making coil chains of over 2-inch links, power presses are used to form the links and steam hammers to weld them.

The *eo nomine* provision for chains used for the transmission of power first appeared in the Tariff Act of 1930. In the prior acts of 1922 and 1913, in addition to the provision for chain and chains of all kinds, made of iron or steel, sprocket and machine chains were provided for. (The 1922 act also provided for anchor or stud link chain.)

In the Summary of Tariff Information (1920), with relation to the chain provision, the following appears under the caption "General Information"— "Description and uses":

Structurally, *chains made of iron or steel* may be divided into those (1) whose separate links are of a single piece of metal and those (2) with links of several pieces of metal. The first are used generally for fastening objects together or supporting or lifting weights. Such chains, if small, are chiefly made by machinery, but larger sizes are usually handmade. Chains for cranes, ships' cables, dredges, etc., have each link welded by hand, often both formed and welded from the rolled bar iron. Those of the second class are known as *sprocket* or *machine chains* and are used for transmitting power. In certain of these each link is made of several pieces of metal connected by rivets, bolts, or steel screws, and so formed as to engage with the teeth of a sprocket wheel. The bicycle chain is a familiar example. [Italics quoted.]

From the evidence of record in this case, it seems clear that the merchandise invoiced as "Conveyor Chain," by virtue of its construction and use, comes within the purview of the *eo nomine* provision for chains used for the transmission of power, in paragraph 329, as modified, supra.

Although defendant in the present case has offered some testimony to the effect that in the chain industry a distinction is drawn between conveyor chains and chains used for the transmission of power or drive chains, the court is constrained in the light of the record before it and following the principle of *stare decisis* to adhere to its position that conveyor chains are chains used for the transmission of power. In the case of United States v. Mercantil Distribuidora, S. A., Empacadora Trevino, S. A., The Tupman Thurlow Co., Inc., 45 CCPA 20, 23, C.A.D. 667, it was aptly stated:

* * * The rule of *stare decisis*, sometimes known by another Latin phrase meaning "not to disturb what is settled," is applicable here too. The public policy of putting an end to litigation and of not reopening questions which have been decided. is a sound one, subject only to the qualification that *clear* error should not be perpetuated. Courts should maintain an open mind and give thoughtful consideration to sincere arguments that they should reverse themselves. But it must be remembered that when they do this they unsettle the law and add to the turmoil of this world, which already has enough. Hence sound policy dictates that prior decisions shall stand until the court is *convinced* they are wrong. * * * [Italics quoted.]

In the circumstances of the instant case, the record as presented does

not warrant a departure from the holding of this court in the *General Chain* case, supra. Accordingly, we hold that the chain links in controversy should properly have been classified by the collector of customs as parts of chains used for the transmission. of power of the kind provided for in paragraph 329 of the Tariff Act of 1930, as modified by the Japanese protocol, supra, which provides for duty at the rate of 12½ per centum ad valorem.

There remains for the court's consideration the proper classification of the H–78 and C 132S rivets covered by protest 64/1691.

On this phase of the case, plaintiffs' witness I'Anson testified that he had observed the manufacture and processing of rivets such as plaintiffs' exhibits 4 and 5. He stated the rivets are made from a rolled bar which has been cut to desired length. A head is formed by pressing into a die. The rivet is then cleaned or deburred as may be required. The heads of the instant rivets are specially shaped with a slight indentation in the heads to prevent them from turning in the holes in which they are placed. Such rivets are sold separately or with chains and are bought and sold by size.

In addition to being used to connect links to chain, the rivets are also used to join attachments used on chain and in sawmill machinery. As representing the latter use, plaintiffs' illustrative exhibit 7 was received in evidence and referred to as a "4–F attachment" wherein a rivet similar to an H–82 rivet was used. Another chain attachment referred to is depicted in the proper portion of page 12 of plaintiffs' exhibit 6 illustrating the use of C 132 and C 132S rivets, similar to those in issue.

Witness I'Anson stated that the rivets in controversy represented by exhibits numbers 4 and 5 are composed either of iron or steel. In the use of the rivet contained in plaintiffs' exhibit 5, it was I'Anson's testimony that the end opposite the head, after being inserted in place, was "bent over" "By heating and swaging or hammering to fold or swell the metal up into a form of what is commonly known as a riveted end."

Plaintiffs' claim that the rivets at bar by their use with the chain links in controversy are likewise parts of chains used for the transmission of power must fall. The record before us is lacking in proof that the rivets at bar are chiefly used for the manufacture of H–78 and H–132 chain links. In fact, at the time of briefing, plaintiffs in so many words concede that said rivets are not dedicated to use as parts of chain and rely on their claim that said articles are classifiable pursuant to the *eo nomine* provision for rivets of iron or steel, not specially provided for, in paragraph 332 of the Tariff Act of 1930, as modified, supra.

In support of its position, plaintiffs cite the case of Remington Rand, Inc. v. United States, 20 Cust.Ct. 1, C.D. 1075, wherein certain "Stator Rivets" and "Rotor Rivets" measuring .598 of one inch in length and .093 of one inch in diameter and .529 of one inch in length and .093 of one inch in diameter, respectively, designed for use exclusively in the manufacture of electric shavers which had been classified by the collector of customs as articles, not specially provided for, composed wholly or in chief value of iron, in paragraph 397 of the Tariff Act of 1930 were held to be within the provision for rivets of iron, not specially provided for, in paragraph 332 of said act.

In the course of the decision in the *Remington* case, supra, the court, in the absence of any evidence or contention to the contrary, proceeded on the assumption that the common and commercial meanings of the term "rivet" were the same and set forth various lexicographic definitions of the word, some of which definitions are here quoted.

Webster's New International Dictionary, second edition 1935:

rivet—A headed pin or bolt of some malleable material, as wrought iron, soft steel, or copper, used for uniting two or more pieces by passing the shank through a hole in each piece and then beating or pressing down the

plain end so as to make a second head. Small rivets are usually closed cold, but larger rivets are closed at a forging heat. Rivets are distinguished by the shape of their heads, as panhead, conehead, buttonhead, flathead, steeple-head, flush-head, and countersunk-head rivets, and by their use, as structural, tinner's belt, etc.

Funk & Wagnalls New Standard Dictionary, 1932 edition:

rivet—a short soft metal pin having usually a head on one end, used to connect two plates of metal or other substance together by passing it through holes and spreading its headless end by hammering or pressing until a second head is formed.

Knight's American Mechanical Dictionary, volume III, at page 1947:

Rivet. (Machinery) A short bolt with a flat or rose head, employed for uniting two plates or thin pieces of material together. The stub end is swaged to prevent its withdrawal. When used for joining pieces of leather, as in making belting, an annular disk, termed a burr, is placed over this end previous to swaging, in order to give a greater bearing.

Rivets are cut from round metal rods, and formed by special machinery.

New Century Dictionary of the English Language (1946 edition):

rivet * * * A metal pin or bolt for passing through holes in two or more plates or pieces to hold them together, usually made with a head at one end, the other end being hammered into a head after insertion.

And for the purposes of the present case we are updating certain of the foregoing definitions of the word "rivet" to reflect current editions of the lexicographic authorities. By so doing, however, we do not detract an iota from the import of the *Remington* decision inasmuch as the variation in language of the definitions over the years is minimal and the cogency of the decision remains undiminished.

Webster's Third International Dictionary of the English Language, 1966:

rivet, *n.* A headed pin or bolt of some malleable material (as wrought iron, mild steel, or copper) used for uniting two or more pieces by passing the shank through a hole in each piece and then beating or pressing down the plain end so as to make a second head.

Funk & Wagnalls Standard Dictionary of the English Language, International Edition, 1963:

rivet, *n.* A short, soft metal bolt, having a head on one end, used to join objects as metal plates, by passing the shank through holes and forming a new head by flattening out the headless end. * * *

The foregoing definitions appear to describe very aptly and clearly the physical appearance and use of the rivets at bar as represented by exhibits 4, 5, and 7 and page 12 of exhibit 6 offered in evidence by the plaintiffs herein.

Counsel for defendant in its brief argues that the instant rivets do not come within the common understanding of the term for several reasons. In the first place, the rivets in issue "are not used in the sense of attaching one flat smooth piece of metal to another" (defendant's brief, page 22). Secondly, the ultimate shaping of the end originally headless is done by heating and not by hammering. And lastly, in defendant's exhibit A, a catalog published by the Canadian company who manufactured the instant rivets, such items are referred to as "pins."

Considering the objections in reverse order, we are of the opinion that the fact an article may be designated by a different name in a foreign country, even though that country shares our language, does not lessen the applicability of the claimed provision to the imported articles when the fact of the difference in terminology has been attested to and explained by plaintiffs' witness I'Anson and when some of the dictionary definitions of the word "rivet" above set forth define a "rivet" as a "pin."

As to the ultimate shaping of the headless end, the record before the court contains the unrebutted testimony of plaintiffs' witness I'Anson that, after a rivet is inserted in place, the end opposite the head is "bent over" "By heating and swaging or hammering to fold or swell the metal up into a form of what is commonly known as a riveted end." The fact that, in the process of forming the riveted end, heating and swaging (a pressing operation) may be employed in place of or in addition to hammering does not, in our opinion, make what otherwise conforms to the common understanding of a rivet any the less such an article. This position is supported by a visual examination of plaintiffs' exhibits 5 and 7 wherein the head formed after insertion in place bears every appearance of a typical riveted end.

By its first objection, to wit, that the rivets in issue "are not used in the sense of attaching one flat smooth piece of metal to another," defendant is limiting the definition of "rivet" to an article of particular characteristics used to connect two "plates" of metal together. We do not believe from a reading of the dictionary definitions above set forth that the term "rivet" should be so restricted as to exclude from its scope an article possessing all the other features of a rivet but which, as here, instead of connecting two plates of metal is used to connect the two side bars of a chain link.

In support of such a position, we quote from the *Remington* case, supra, as follows:

As pointed out above, some lexicographic authorities describe a "rivet" as "a short soft metal pin having *usually* a head on one end, used to connect *two* plates of metal or other substances together * * *." [Italics supplied.] Other definitions indicate that a rivet may be used to connect two or *more* plates; still other definitions omit the word "usually" in defining a "rivet." However, it is the opinion of the court, which seems to be borne out by thoughtful consideration of various definitions of the word "rivet," that rivets may be made with or without a head on one end, and may be used to connect two plates of metal or other substances, or more than two such plates. We conclude, therefore, that the provision in paragraph 332, supra, for "rivets of iron or steel, not specially provided for" embaces rivets of all kinds when of the materials specified and when used in the manner above described.

In Cabell v. Markham, Alien Property Custodian et al., 2 Cir., 148 F.2d 737, where defendants were contending that the courts were not free to depart from the literal meaning of certain words of a statute "however transparent may be the resulting stultification of the scheme or plan as a whole," Learned Hand, Circuit Judge, writing the opinion for the Circuit Court of Appeals, Second Circuit, said—

Courts have not stood helpless in such situations; the decisions are legion in which they have refused to be bound by the letter, when it frustrates the patent purpose of the whole statute. We need cite no others than the more recent of those in the Supreme Court which have followed Rector, etc., of Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226; * * * [Citing numerous cases.]

Further, Judge Hand observed—

* * * Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, sources of interpreting the meaning of any writing, be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning. * * *

Also to be considered is the general rule applicable to customs law that where a dutiable provision names an article without terms of limitation all forms of the article are thereby included unless a contrary legislative intent otherwise appears (Smillie & Co. v. United States, 11 Ct.Cust.App. 199, T.D. 38966). \* \* \*

Defendant cites the case of John S. Connor v. United States, 41 Cust.Ct. 26, C.D. 2016, wherein certain so-called steel pins or wire pins, having a diameter of 0.294 to 0.296 of an inch and 1¼ or ⅝ inches long, usually driven into the wooden side rails of beds for the purpose of holding in place a metal bed-rail hook, were held on the record there presented not to be within the provisions for nails, spikes, or rivets in the Tariff Act of 1930, as modified. In view of the factual differences in the *Connor* case and those at bar, we believe the *Connor* case to be clearly distinguishable.

In disposing of the claim of plaintiff pertaining to the rivets in issue, we adopt as particularly appropriate to the facts and issue of the instant case the following language from the *Remington* case, supra:

Noting the variations in the definitions of "rivet," to which reference has been made above, and bearing in mind that dictionaries may be referred to not as evidence of the meaning of language but merely as "aids to the memory and understanding of the court," and considering the character, nature, form, shape, material of which made, and exclusive use of the imported commodity, we are of the opinion that the articles clearly respond to the popular conception of what are commonly known as rivets, and we so hold.

In the circumstances of the present case and predicated on the foregoing considerations, the claim of plaintiffs that the H–78 rivets covered by entry 05 7321 and the C–132S rivets covered by entry 05 7944, the subject of protest 64/1691, should properly have been classified as rivets of iron or steel, not specially provided for, in paragraph 332 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, supra, and assessed with duty at the rate of ½ cent per pound, is sustained.

Judgment will issue in conformity with the views above expressed.